******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# M. W. *v.* G. C.*
## (AC 47189)

Alvord, Seeley and Flynn, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court dissolving his marriage to the plaintiff. He claimed that the court abused its discretion in making its property distribution orders because the court's factual findings were clearly erroneous. *Held*:

The trial court's factual finding as to the defendant's income was not clearly erroneous, as the defendant's evidence as to his income was internally inconsistent and incomplete, and the court's findings regarding the plaintiff's testimony and the defendant's representations made in his applications to mortgage lenders were supported by the record.

The trial court's factual finding as to the value of the parties' marital home was not clearly erroneous, as the court's determination was based in part on exhibits the defendant entered into evidence at trial, including an appraisal of the property, a hypothetical real estate closing statement created by the defendant's counsel for the purpose of aiding the court, and a tax assessor's card, and the court was not required to credit the defendant's testimony regarding the fair market value of the property.

Argued December 10, 2024—officially released May 20, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant filed a cross complaint; thereafter, the case was tried to the court, *Vizcarrondo, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court. *Affirmed*.

*Igor G. Kuperman*, for the appellant (defendant).

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

*Opinion*

ALVORD, J. The defendant, G. C., appeals from the judgment of the trial court dissolving his marriage to the plaintiff, M. W.[1] On appeal, the defendant challenges the court's property distribution orders on the basis that the court made clearly erroneous factual findings as to (1) the defendant's net income and (2) the value of the marital home. We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The parties were married on March 17, 2018, and no children were born of the marriage. The plaintiff initiated the dissolution proceeding in November, 2021, and the defendant filed a cross complaint in December, 2021. The matter was tried to the court, *Vizcarrondo, J.*, over several days.[2] Both parties testified, in addition to other witnesses, and submitted a number of exhibits into evidence. Both parties were represented by counsel and filed posttrial briefs. In its November 30, 2023 memorandum of decision, the court found that each of the parties had children from a prior relationship. The court found that the defendant engaged in domestic violence during the marriage, including physical abuse and coercive control. The court recounted an incident on June 23, 2020, in which the defendant punched the plaintiff's daughter, then a teenager, in the face after she attempted to intercede in an argument between the parties. The defendant pleaded guilty to assault in the third degree, and a restraining order was entered against him. The court found the defendant's misconduct to be the principal cause for the breakdown of the marriage and that he

[1] The plaintiff did not file an appellee's brief. As a result, this court ordered the appeal to be considered on the basis of the defendant's brief and the record, as defined by Practice Book § 60-4, and oral argument by the defendant.

[2] A related civil action was consolidated with the dissolution trial.

"controlled the household finances and acted to restrict the plaintiff and her daughters' interactions with others to a degree consistent with coercive control."

The court found the plaintiff's net weekly income to be $650 as a financial advisor selling life insurance and the defendant's net annual income to be $90,000 as a construction contractor. The court made findings with respect to the marital home, which the parties had purchased for $515,000 in 2019. The court found that the defendant sold the marital home during the pendency of the litigation in violation of the court's automatic orders. The court issued a remedial property distribution order requiring the defendant to pay the plaintiff $91,600.

With respect to its remaining financial orders, the court denied the plaintiff's claim for alimony, noting "the relatively short duration of the marriage, the plaintiff's active employment, her good health, and the financial orders made pursuant to General Statutes § 46b-81." The court ordered, inter alia, that the defendant would retain his 100 percent interest in his business. The court declined to award attorney's fees. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Both of the defendant's claims in this appeal challenge the factual findings underlying the court's distribution of marital property. Section 46b-81 provides in relevant part: "(a) At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . . (c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of

income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates.''

''The standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did.'' (Internal quotation marks omitted.) *Ferraro* v. *Ferraro*, 168 Conn. App. 723, 727, 147 A.3d 188 (2016).

I

The defendant's first claim on appeal is that the court's factual finding as to his income was clearly erroneous. Specifically, he contends that the ''plaintiff's unfounded claims could not form the basis for the trial

court's finding." The defendant further argues that, because the court did not credit his representations of his income to third parties, the court could not have concluded that "the same representations were an accurate picture of the defendant's actual income." We are not persuaded.

The court had before it the following evidence as to the defendant's income. The plaintiff introduced into evidence a 2022 application for the emergency mortgage assistance program signed by the defendant, in which he represented his income to be $12,479 gross per month. Attached to that application was a profit and loss statement for the time period of January 1 through August 31, 2022, which, according to the defendant's testimony and the date on the document, the defendant signed in September, 2022. The profit and loss statement reflected monthly income of $12,479.50 over the eight month period of January 1 through August 31, 2022.[3] When questioned regarding the profit and loss statement, the defendant testified that, despite having signed the statement at the conclusion of the eight month period, his recollection was that the document was prepared using an estimate of what he would be making if he had his company working. Upon further questioning, the defendant testified that "everything that I was doing with this paperwork was in order to avoid losing the property."

The plaintiff testified that, although she did not know exactly how much money the defendant was making at the time of trial, she knew that he had a "big contract," funded by insurance proceeds, to "redo" his uncle's house after a fire. She also testified that he had made $120,000 one year and that "he always works probably

---

[3] The statement reflected a total income of $116,465 for that time period. It identified deductions for car and truck expenses, contract and labor, insurance, a professional service fee, office expenses, supplies, licenses and fees, and other expenses, for a net profit of $99,836 over the eight months.

70 percent cash and 30 percent in checks just because he has to declare something and pay his workers. He only had one worker with Social Security. Everybody else he pays cash and that's why when he makes his contracts, he always be sure that he gets [a] big chunk of cash on the side."

The defendant's evidence as to his income was internally inconsistent and incomplete. On one occasion, he testified that the most he had earned in any year was $70,000. On another occasion, he testified that the most he had earned in any year was $50,000. On each of the defendant's financial affidavits filed in this action, he identified a gross weekly income and used the same figure as his net weekly income; he did not identify any mandatory deductions. For example, his February 3, 2022 financial affidavit reflected $120 in gross weekly income, $0 in mandatory deductions, and $120 in net weekly income. His July 19, 2023 financial affidavit reflected $600 in gross weekly income, $0 in mandatory deductions, and $600 in net weekly income.

The court made the following factual findings with respect to the defendant: "Throughout the marriage he was a construction contractor. At trial, the defendant testified that his gross earnings never exceeded $60,000 in any given year; though he concedes that he deliberately misrepresented his income as $144,000 in connection with his efforts to refinance the marital home.

"The court finds that the defendant's trial testimony has been self-serving and not credible. The defendant's testimony concerning his income is no exception. Based on the plaintiff's personal observations, the court finds that the defendant received a significant portion of his income as undisclosed cash. Based in part o[n] the defendant's representations to mortgage lenders, the court finds that his yearly gross income is at least

$120,000, and that his net annual income after taxes and mandatory deductions is properly valued at $90,000.''

We cannot conclude that the court's findings as to the defendant's income are clearly erroneous. First, we note that the defendant's submissions to the court were both lacking in candor and incomplete. "We have often said that a party who fails to provide information to the court will not later be heard to complain that the court made orders without sufficient information." *Fronsaglia* v. *Fronsaglia*, 202 Conn. App. 769, 785, 246 A.3d 1083 (2021); see also *Rosenfeld* v. *Rosenfeld*, 115 Conn. App. 570, 581, 974 A.2d 40 (2009) ("[w]here a party's own wrongful conduct limits the financial evidence available to the court, that party cannot complain about the resulting calculation of a monetary award" (internal quotation marks omitted)). Second, the court's findings regarding the plaintiff's testimony and the defendant's representations made in his applications to mortgage lenders were supported by the record. "The trial court, as trier of fact, determined who and what to believe and the weight to be accorded the evidence. The sifting and weighing of evidence is peculiarly the function of the trier." (Internal quotation marks omitted.) *Nunez* v. *Nunez*, 85 Conn. App. 735, 738, 858 A.2d 873 (2004). Accordingly, the defendant's claim fails.

II

The defendant's second claim on appeal is that the court's factual finding as to the value of the marital home was clearly erroneous. We are not persuaded.

The court made the following findings with respect to the marital home. Although title to the home was exclusively in the defendant's name, the plaintiff contributed more than one half of the $77,237.97 down payment and substantial sums toward the mortgage. These contributions would have entitled her to a substantial share of any proceeds from the sale. The marital

home was in foreclosure at the time of trial, and a foreclosure auction date had been set. In the context of the foreclosure action, the marital home was valued at no less than $715,000. The defendant had attempted to refinance the property to avoid the foreclosure and had requested that the court grant him exclusive possession of the premises, in part because residency in the home was one of several requirements to be stated to obtain modification of the mortgage obligation. The defendant acted with knowledge of the home's value and with the intention of preserving that value. On February 22, 2023, the defendant unilaterally sold the home, at a claimed sale price of $540,000. This amount equaled the debt related to the property, including unpaid mortgage principal, interest, real estate taxes, and unpaid homeowners insurance. The defendant denied receiving any additional compensation beyond the claimed sale price.[4]

The plaintiff filed a motion for contempt of the automatic orders. After a hearing, the court found that the automatic orders were clear and unambiguous and that the defendant sold the marital home without notice to his counsel, the plaintiff, or the court. The court found not credible "the defendant's claim that the value of the transaction resulted merely in satisfaction of the mortgage debt, taxes, interest, liens, and other costs, such that the sale did not yield any net proceeds. The defendant is not unsophisticated. To the contrary, throughout the proceedings, he demonstrated a keen awareness of the value of all property he deemed his. But, even if the sale did not in fact result in proceeds, the court finds that the defendant's actions were, at a minimum, spiteful and intended to deprive the plaintiff of any financial benefit, and to undermine this court's authority to order and effectuate an equitable property

---

[4] The defendant did not introduce any documentary evidence in support of his testimony that he sold the property for $540,000.

settlement. In so finding, the court concurs with the plaintiff's assessment that the unilateral sale can 'only be viewed as a final act of retaliation towards the plaintiff . . . .' "

Accordingly, the court found the defendant in contempt on the basis that he had wilfully violated the court's automatic orders. The court considered "[t]he defendant's contumacious conduct, and the economic harm suffered by the plaintiff," in its property award issued pursuant to § 46b-81. Specifically, the court found that an open market sale would have yielded proceeds in the amount of $175,000, with closing costs of approximately $37,000, resulting in total net proceeds after costs of $138,000. The court expressly considered the defendant's history of domestic violence throughout the marriage and his deliberate litigation misconduct in awarding the plaintiff 70 percent of the imputed net value of the marital home's proceeds. The court ordered that amount to be reduced by $5000, the value of the furnishings remaining within the home at the time of trial. Accordingly, the court ordered the defendant to pay to the plaintiff a property settlement of $91,600, to be paid in sixty monthly installments of $1527.

We are not persuaded by the defendant's claim that the court could not reasonably have concluded as it did in valuing the property at $715,000. At trial, the defendant entered into evidence as a full exhibit the August 31, 2021 appraisal valuing the property at $715,000. The defendant also entered into evidence a real estate closing statement, created by the defendant's counsel for the purpose of aiding the court, showing that a hypothetical sale of the property at a price of $715,000 would yield approximately $150,000 in net proceeds as of December 31, 2022. Finally, the defendant entered into evidence the 2018 tax assessor's card, which identified an appraised value of $708,230. Although the defendant testified that he believed the

fair market value of the property based on the property's condition to be between \$650,000 and \$680,000,[5] the court was not required to credit his testimony. See *Cimino* v. *Cimino*, 155 Conn. App. 298, 301–302, 109 A.3d 546 ("[a]lthough there was other evidence, including testimony from the parties, that the home's fair market value was higher, the court was not required to accept those figures" (footnote omitted)), cert. denied, 316 Conn. 912, 111 A.3d 886 (2015).

We conclude that the court's determination regarding the value of the marital home, based on an appraisal admitted into evidence, was proper. See *Bevilacqua* v. *Bevilacqua*, 201 Conn. App. 261, 274–76, 242 A.3d 542 (2020) (where defendant failed to provide financial affidavit and denied owning property in Bahamas during deposition, court did not abuse its discretion in awarding such property to defendant and valuing it based on estimate defendant had provided in prenuptial disclosure); *Porter* v. *Porter*, 61 Conn. App. 791, 800, 769 A.2d 725 (2001) (court's valuation, which was less than both parties requested, was not clearly erroneous where neither party provided court with expert testimony as to value of home and, as a result, court was left with claims of parties and general knowledge to establish value). Accordingly, we conclude that the court did not abuse its discretion in rendering its property division order.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] In his November, 2022 financial affidavit, the defendant also estimated the fair market value of the marital home to be \$680,000. After subtracting the mortgage current principal balance and equity line of credit and other liens, the defendant identified equity in the amount of \$108,000.